UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------x
                             :

BRUCE E. MATTEO              :     3:17 CV 1821(RMS)
                             :
                             :

V.                             :
                             :

NANCY A. BERRYHILL,      :
ACTING COMMISSIONER OF   :
SOCIAL SECURITY[1]       :
                             :     DATE: FEB. 15, 2019
------------------------------------------------------x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM

      This action, filed under Section 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social Security

["SSA"] denying the plaintiff Disability Insurance Benefits ["DIB"].[2]

I.      ADMINISTRATIVE PROCEEDINGS

      On April 19, 2012, the plaintiff, Bruce Matteo filed an application for DIB, in which he

alleged that he has been disabled since September 1, 2007 due to a back injury. (Certified

Transcript of Administrative Proceedings, dated December 29, 2017 ["Tr."] 188-91).[3]  After

---

[1] On January 21, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.  The Federal Vacancies Reform Act limits the time a position can be filled by an acting official, 5 U.S.C. 3349(b); accordingly, as of November 17, 2017, Nancy Berryhill is serving as the Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security.

[2] Plaintiff filed an application for Supplemental Security Income Benefits, which application was denied on April 26, 2012.  (Tr. 752-60). That application is not at issue in this case as it was not at issue in the underlying case before the district court; on remand, the ALJ denied the plaintiff's motion to reopen the 2012 application for the same reason. (*See* Tr. 515).

[3] A supplemental transcript, dated January 3, 2018, was filed on March 26, 2018. (Doc. No. 20).

exhausting his administrative remedies, he commenced an action in this court which resulted in judgment entering in favor of the plaintiff, and a remand of his case to the Office of Disability Adjudication and Review's New Haven Hearings Office. (Tr. 540-43, 545-73; *see Matteo v. Colvin*, 3:15 CV 440(WWE)(JGM), Doc. No. 19 ["August 2016 Recommended Ruling"], approved and adopted by Senior United States District Judge Warren W. Eginton, Doc. No. 22; *see generally* Tr. 1-282, 574-668, 692-751).  Upon remand, a hearing was held on April 21, 2017, before Administrative Law Judge ["ALJ"] Deirdre R. Horton. (Tr. 1471-1522; *see generally* Tr. 674-81, 767-82, 794-97). On August 2, 2017, the ALJ issued her decision denying the plaintiff benefits. (Tr. 511-30).  No written exceptions were filed, and the Appeals Council did not take "own motion" review, thus, the ALJ's decision became the final, appealable decision of the Commissioner.  *See* 20 C.F.R. § 404.984(a) ("[W]hen a case is remanded by a Federal court for further consideration, the decision of the [ALJ] will become the final decision of the Commissioner after remand . . . unless the Appeals Council assumes jurisdiction of the case."); 20 C.F.R. § 404.984(d) ("If no exceptions are filed and the Appeals Council does not assume jurisdiction of [the] case, the decision of the administrative law judge becomes the final decision of the Commissioner after remand.").

On December 21, 2017, the plaintiff filed his complaint in this pending action.  (Doc. No. 1),[4] and on February 26, 2018, the defendant filed her answer and administrative transcript, dated December 29, 2017 (Doc. No. 16), followed by a supplemental transcript, dated January 3, 2018. (Doc. No. 20). On June 6, 2018, the plaintiff filed his Motion to Reverse the Decision of the

---

[4] The plaintiff also filed a Motion for Leave to Proceed *in Forma Pauperis* (Doc. No. 2), which motion was granted the next day. (Doc. No. 10).

Commissioner, with Statement of Material Facts and brief in support. (Doc. No. 25; *see* Doc. No. 26 (Amended Statement of Material Facts)).[5]  On July 13, 2018, the parties consented to the jurisdiction of a United States Magistrate Judge, and the case was transferred to this Magistrate Judge. (Doc. No. 29). On July 19, 2018, the defendant filed her Motion to Affirm, with brief in support. (Doc. No. 30).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 25) is *denied*, and the defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 30) is *granted*.

II.    REMAND ORDER

In the August 2016 Recommended Ruling, Judge Margolis concluded that remand for the "proper consideration and treatment" of the opinion of Dr. Gary Linke, the plaintiff's chiropractor, was appropriate given the long treatment history "specifically for the back impairments for which [the plaintiff] claims disability."   (Tr. 568).   Additionally, as stated in the August 2016 Recommended Ruling:

> A remand is particularly important in this case in light of the balance of the ALJ's treatment of the other opinions of record.  The ALJ concluded that [the] plaintiff is capable of a more restrictive RFC than the RFC assessment made by both State medical consultants, . . . but the ALJ did not discuss their opinions other than to state that they "do deserve come weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions." Similarly, the ALJ assigned limited weight to Dr. Mongillo's opinion because it "was based upon a one-time consultative examination[,]" Dr. Mongillo "did not have diagnostic testing to review[,] and the evidence reflects that the claimant treated with only physical therapy and over-the-counter pain medication." However, when an ALJ does not assign controlling weight to the opinion of the treating provider, the ALJ must explain the weight given to the opinions of the State agency consultants by considering the relevant factors set forth in the Regulations.  20 C.F.R. § 404.1527.

---

[5]A copy of case law is attached to plaintiff's brief in support.

The ALJ failed to do so in this case; upon remand, she shall properly explain the weight assigned to the opinions of record.

As for [the] plaintiff's treating providers' opinions, the ALJ's treatment of such records is inconsistent in that she assigned them limited weight because of the timing of such opinions, but yet went on to weigh such opinions against the record. . . .

(Tr. 568-69) (internal citations omitted).  Additionally, as stated in the August 2016 Recommended Ruling, "[a]lthough the ALJ did conflate Dr. Parillo's opinion and his underlying treatment notes, the ALJ was correct that Dr. Parillo noted improvement in [the] plaintiff's condition under his case, and noted the record of improvement in [the] decision." (Tr. 570) (internal citations omitted). Judge Margolis concluded that,

on remand, the ALJ must weigh [the] plaintiff's credibility after, and in light of, proper consideration of the opinions and the objective evidence of the record.  Once the ALJ revisits the opinions of record consistent with this remand order, the ALJ shall consider what effect, if any, such consideration has on [the] plaintiff's RFC and the corresponding vocational analysis.

(Tr. 571).

Following Judge Eginton's ruling approving and adopting the August 2016 Recommended Ruling over objection, judgment entered, and the case was remanded to the Appeals Council.  (Tr. 573).  The Appeals Council remand order "vacate[d] the final decision of the Commissioner of Social Security and remand[ed] th[e] case to an Administrative Law Judge for further proceedings consistent with the order of the court."  (Tr. 542).  Additionally, the Appeals Council directed the ALJ "to offer the claimant the opportunity for a new hearing, take any further action needed to complete the administrative record and issue a new decision."  (Tr. 542).

In her decision, ALJ Horton stated: "To implement the Court's remand order, the Appeals Council ordered a new hearing, without additional instructions.  The remand requires the

4

undersigned to assess pain-related and residual functional capacity issues described in the "August 2016 Recommended Ruling which was approved and adopted in September 2016." (Tr. 514).

III.    FACTUAL BACKGROUND

As noted above, the plaintiff's alleged onset date was September 1, 2007, and his date last insured was December 31, 2012. Familiarity with the extensive factual background as it existed up to October 2013, including the plaintiff's activities of daily living, his medical records, the assessments of the State agency consultants, and the medical opinions, is presumed and is detailed in the August 2016 Recommended Ruling. *See Matteo v. Colvin*, 3:15 CV 440 (WWE)(JGM), Doc. No. 19 at 2-14.

Following remand to the ALJ, a hearing was held on April 21, 2017, at which the plaintiff, APRN Linda Grisgraber, and a vocational expert testified. (Tr. 1471-1522). Their testimony is detailed below. *See* Section IV.B. & IV.E. *infra.* At that point, the plaintiff was 47 years old (Tr. 1477). He testified that he has worn a back brace when walking since it was prescribed to him in the middle of 2012. (Tr. 1481-82). The plaintiff recounted that he had performed food service work until May 2005, following which he collected unemployment for 26 weeks, and began seeing Dr. Gary Linke, a chiropractor, and then Dr. Lucien Parillo who treated the plaintiff with epidural shots in his spine. (Tr. 1483-86). The plaintiff testified that he has been treated by APRN Grisgraber for the past four years to get him "mentally balanced[.]" (Tr. 1486). The plaintiff also testified that, in addition to his back issues, his hands "clinch up" and he "drops stuff" but that he declined surgery because he is "scared" of it. (Tr. 1491-92).

He testified that his partner performs most of the house and yard work, and his partner's mother, who lives with them, "cooks a lot of meals[.]" (Tr. 1494). The plaintiff also testified that

he fell in the previous two years after losing his balance in his kitchen; CT scans revealed that he suffered a concussion. (Tr. 1495).

IV.    THE ALJ'S DECISION

Following the five-step evaluation process,[6] the ALJ found that the plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of September 1, 2007 through his date last insured of December 31, 2012. (Tr. 517, citing 20 C.F.R. § 404.1571 *et seq.*). The ALJ concluded that through his date last insured of December 31, 2012, the plaintiff had the following severe impairments: degenerative disc disease of his lumbar spine and minimal cervical stenosis at C3-4. (Tr. 517-23, citing 20 C.F.R. § 404.1520(c)). The ALJ explained that APRN Grisgraber's hearing testimony that the plaintiff's mental impairments are disabling was not supported by the chronological treatment history; the record revealed a history of "favorable mental/cognitive relationships" with the plaintiff's longtime employer; and, the record did not support a history of mental limitations before the plaintiff's date last insured. (Tr. 517-22). She next found that, through his date last insured, the plaintiff did not have an impairment or

---

[6] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520(a). First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *See* 20 C.F.R. § 404.1520(b). If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo*, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

combination of impairments that met or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 524, citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). The ALJ noted that the medical evidence did not support a finding that the plaintiff's back impairment met Listing 1.04 as he had "no nerve root compression[,]" he could walk without an assistive device, and he did not have "major disc herniation." (Tr. 524).

At Step Four, the ALJ concluded that, "[a]fter careful consideration of the entire record," the plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except lifting and carrying was limited to ten pounds; standing and walking was limited to four hours per eight-hour workday; he was unable to climb ladders/ropes/scaffolds or stairs; he could do occasional stooping and kneeling, and no crouching or crawling; and could do frequent balancing, handling and reaching. (Tr. 524-28). The ALJ discussed the treatment records of Dr. Samma, which she found inconsistent and lacking "clinical findings"; she addressed Dr. Parillo's treatment records in which "the claimant described . . . improvement in his pain level and activity level"; and she discussed Dr. Linke's records and disability rating in connection with the plaintiff's worker's compensation case, before concluding that "his course of chiropractic care, if anything, would support less work restrictions than are adopted [by the ALJ]." (Tr. 525-26). Additionally, the ALJ found Dr. Mongillo's report "more consistent with the State Agency denial[,]" and "more consistent with Dr. Linke's ten percent disability rating than with the claimant's testimony about alleged, disabling pain." (Tr. 526). Finally, the ALJ considered the consistency of the plaintiff's testimony at the two hearings, with the underlying medical records, as well as the plaintiff's pain, which the ALJ noted was managed with "conservative care." (Tr. 527-28).

The ALJ then concluded that, through his date last insured, the plaintiff was unable to

perform his past relevant work as a cashier, dishwasher and cook's helper (Tr. 528, citing 20 C.F.R.

§ 404.1565), but that there were jobs that existed in significant numbers in the national economy

that the plaintiff could have performed, such as the work of an assembler of small products, an

inspector/hand packager, or a mail room clerk. (Tr. 528-29, citing 20 C.F.R. §§ 404.1569 and

1569(a)). Accordingly, the ALJ concluded that the plaintiff was not under a disability, as defined

in the Social Security Act, at any time from September 1, 2007, through his date last insured,

December 31, 2012. (Tr. 529, citing 20 C.F.R § 404.1520(g)).

V.     STANDARD OF REVIEW

       The scope of review of a Social Security disability determination involves two levels of

inquiry. First, the court must decide whether the Commissioner applied the correct legal principles

in making the determination. Second, the court must decide whether the determination is supported

by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted).

The court may "set aside the Commissioner's determination that a claimant is not disabled only if

the factual findings are not supported by substantial evidence or if the decision is based on legal

error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation

omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind

would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v.

Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d

Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and

conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189

(D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)

(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its

judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

VI.     DISCUSSION

A.     PLAINTIFF'S CLAIMS

The plaintiff contends that the ALJ erred in failing to find a severe mental impairment (Pl.'s Mem. at 8-16) and, at Step Three, in the determining whether the plaintiff's back impairments met a Listing. (Pl.'s Mem. at 17-18).   Additionally, the plaintiff argues that the ALJ did not follow the treating source rule in that she did not specify the weight she assigned to the opinions of Dr. Muneeb Samma, did not properly consider Dr. Frank Mongillo's opinion and erred in her treatment of Dr. Lucien Parillo's and the plaintiff's chiropractor's opinions.   (Pl.'s Mem. at 1-8).   According to the plaintiff, the ALJ misconstrued the evidence relating to the plaintiff's pain and his pursuit of conservative treatment. (Pl.'s Mem. at 18-21).   Finally, the plaintiff maintains that the ALJ's Step Five findings are unsupported.   (Pl.'s Mem. at 21-28).

B.     ESTABLISHING DISABILITY PRIOR TO THE DATE LAST INSURED

To be eligible for benefits, the plaintiff must show that he had a disabling condition, lasting twelve months or longer, within the period of coverage, which in this case was September 1, 2007 through December 31, 2012. *See* 42 U.S.C. § 404.320(a). A claimant must be fully insured at the

time that a period of disability starts. *See* 20 C.F.R. § 404.320(b)(2) (applicant must be insured in the calendar quarter the he or she is disabled). The plaintiff must satisfy his burden of establishing that he was disabled prior to his date last insured, December 31, 2012.

C.     THE ALJ DID NOT ERR IN HER CONSIDERATION OF THE PLAINTIFF'S MENTAL IMPAIRMENTS

As discussed in the August 2016 Recommended Ruling, the plaintiff initially claimed disability due to his physical impairments, and thus, his claims of error in the underlying administrative decision related to the ALJ's physical RFC assessment. Accordingly, upon remand, the ALJ was to hold another hearing and "to assess pain-related and residual functional capacity issues described in the August 2016 Recommended Ruling[.]" (Tr. 514)

During the hearing held before ALJ Horton on remand, the plaintiff offered testimony of APRN Grisgraber about the plaintiff's mental, rather than physical, impairments. APRN Grisgraber testified that she had seen the plaintiff for medication management and psychotherapy for the previous "four years[,]" since "2012[.]" (Tr. 1508-09). The APRN testified that she had diagnosed the plaintiff with bipolar disorder 1 with obsessive-compulsive features, PTSD, and more recently, with "chronic pain." (Tr. 1507, 1509-10). She prescribed Depakote, Ativan and Cymbalta. (Tr. 1508). She described the plaintiff, from the time she first started treating him, as having an "extreme amount of irritability, agitation and anxiety, sleep disturbance, and lack of filtering and processing information prior to expressing it." (Tr. 1514; *see* Tr. 1513). She described his impairment, dating back to 2012, as "between marked and extreme." (Tr. 1515). She stated, "[t]here are periods of time where [his] memory is impaired, predominantly related to the degree of anxiety he's experiencing. His limitations in terms of being able to function within a setting of

other workers, . . . is extremely limited." (Tr. 1515). She noted, based her observations, some "mild improvement in symptoms" and that he is "slightly better on the current medication regime, but not to the extent" that he could work in an office and stay on task and focused. (Tr. 1516). APRN Grisgraber testified that the plaintiff is "[m]arkedly limited" in his ability to interact with others, his concentration is "extremely poor[,]" and he is "extremely limited[]" in his daily routine as he has a "circumscribed pattern of behavior that he follows on a daily basis." (Tr. 1518). When asked if the sum of APRN Grisgraber's testimony was that the plaintiff's symptoms "have, if anything, slightly abated over the course of treatment, but that otherwise, . . . . they're essentially the same as they were at the beginning of treatment[,]" APRN Grisgraber responded, "That's correct." (Tr. 1521).

For the plaintiff to prevail on his application for DIB, he must show that his disability commenced on or before his date last insured, which, in this case was December 31, 2012, and that his disability could be expected to last for a continuous twelve months. See 42 U.S.C. § 416(i)(1); 20 C.F.R. § 404.1505(a). Thus, the purpose of APRN Grisgraber's testimony was to establish the existence of symptoms related to her diagnoses of bipolar disorder and PTSD, which she opined have caused "marked" or "extreme" limitations since she began treating the plaintiff in 2012, which was prior to his date last insured. (Tr. 1507-21). APRN Grisgraber's testimony, however, is not supported by the medical record.

The plaintiff's first treatment date with APRN Grisgraber was March 6, 2014 – one year and three months after his date last insured. (Tr. 1021). Additionally, the treatment reflects do not reflect any complaints relating to mental health until February 27, 2013, two months after his date last insured (See Tr. 374 (urgent care visit reporting "depression/anxiety")), and, as the ALJ noted,

the plaintiff did not receive his first formal mental health treatment for depression and anxious mood until early March 2013, approximately ten weeks after his date last insured. (Tr. 519-20; *see* Tr. 454-55 (seen for an initial evaluation for mental health treatment at Cornell Scott-Hill Health Center/Behavioral Health Division at which time he was diagnosed with Adjustment DO mixed depressed mood and anxiety/chronic, as well as bereavement from the loss of his mother and brother); Tr. 456-59 (seen for individual therapy on April 1 and April 8, 2013, at which time he exhibited depressive to mild depressive symptoms); *see* Tr. 445-49, 462-63, 472-76 (July and August 2013 treatment at Hill Health); *see also* Tr. 465 (August 2013 report by the plaintiff that he was able to cope with his panic attacks appropriately, "reducing the impact of panic attacks on his daily functioning[]"); Tr. 467 (September 2013 report of panic attacks, but denied any interferences with his daily functioning)). Although the mental health records all post-date the plaintiff's date last insured, the ALJ considered them before concluding that the records related to the plaintiff's early mental health treatment did not reflect the existence of a "severe" mental impairment. (Tr. 522 (referring to 2013 records reflecting "moderate feelings of depress/anxiety" and conflict with adult siblings)).

The plaintiff bears the burden of establishing the existence of a severe impairment that significantly limits his physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). In the plaintiff's application for benefits, he claimed disability due to his back injury and back pain (Tr. 212, 222; *see also* Tr. 518 (ALJ noted the plaintiff reported no mental limitations in his April 2012 application)), and accordingly, the State agency medical consultants reviewed

only his orthopedic history and pain treatment records.[7] (Tr. 518; *see*, *e.g.*, 115, 120, 125). Additionally, he testified at his 2013 hearing that he could not work due to his "back injury, the pain. My neck, it's the left arm, the right arm, the – shoots down radiating pain and I have carpal tunnel in my left and right wrists." (Tr. 42). The ALJ appropriately discussed the plaintiff's work history in that he worked until 2007, but stopped working "[w]hen he could not increase his physical duties, [and] the employer terminated his employment as of September 2007." (Tr. 515).

The medical evidence, including APRN Grisgraber's testimony, supports the existence of the plaintiff's mental health issues, but the plaintiff did not begin treatment for these issues until after his date last insured. As the ALJ appropriately noted, Grisgraber's testimony was "vague and inaccurate on the starting date of treatment, and showed no review of earlier physical/mental health records." (Tr. 518; *see also* Tr. 520 (detailing the chronology of the progress notes that were inconsistent with APRN Grisgraber's testimony)). Moreover, to the extent that the plaintiff had some mental limitations prior to his date last insured, the ALJ included these in her RFC assessment – limiting the plaintiff to simple, routine work with brief superficial interaction with others. (Tr. 528-29, 1498-99). The ALJ's inclusion of these limitations was consistent with the vocational expert's testimony that an individual with the plaintiff's vocational profile and with an RFC limited to simple, routine work with brief superficial interaction with others, would still be able to perform work existing in significant numbers in the national economy. (Tr. 528-29, 1498-

---

[7] On September 6, 2012, State agency medical consultant Dr. Jeanne Kuslis opined that plaintiff could lift and carry up to fifty pounds occasionally and twenty-five pounds frequently, sit for about six hours, and stand and/or walk for about six hours in an eight-hour workday. (Tr. 115). Dr. Kuslis further concluded that plaintiff was also limited to occasional stooping because of back pain. (Tr. 115). Four months later, on January 9, 2013, State agency medical consultant Dr. Joseph Connolly, Jr. opined that plaintiff could lift and carry up to twenty pounds occasionally and ten pounds frequently, sit for about six hours, and stand and/or walk for about six hours in an eight-hour workday. (Tr. 126). Dr. Connolly further concluded that plaintiff could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, stoop, kneel, crouch, and crawl, and was limited to frequently balancing due to back pain. (Tr. 126-27).

99). Thus, the ALJ's conclusion that the plaintiff's mental impairments did not preclude the plaintiff from performing substantial gainful activity during the relevant time frame is supported by substantial evidence, as it was the plaintiff's burden to establish the existence of a severe mental impairment prior to his date last insured, and in this case, the record lacks such evidence.

D.   THE ALJ DID NOT ERR IN CONCLUDING THAT THE PLAINTIFF DID NOT HAVE A LISTED IMPAIRMENT

The plaintiff bears the burden of showing that his impairment meets or medically equals a listed impairment. 20 C.F.R. 404.1520(a)(4)(iii). If a claimant has an impairment that meets only some of the criteria of a listed impairment, the impairment does not qualify as a listed impairment. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Listing 1.04 applies to disorders of the spine resulting in evidence of nerve root compression, or "[s]pinal arachnoiditis," or "[l]umbar spinal stenosis resulting in pseudoclaudication, . . . and resulting in an inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A. Under Listing 1.00B2b, the inability to ambulate effectively is defined as "an extreme limitation of the ability to walk[,]" such that one cannot "independent[ly] ambulat[e] without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.00B2b.

In her decision, the ALJ concluded that, with regard to the plaintiff's lumbar disorder, the diagnostic tests revealed degenerative changes to his lumbar spine, but no nerve root compression. (Tr. 524). In fact, the MRI of the plaintiff's lumbar spine, taken on November 16, 2012, revealed "mild" results. (*See* Tr. 325-26 ("[v]ery mild disc bulging and facet arthropathy L2-L3 though L4-L5 without significant canal compromise[]"; '[s]mall right foraminal disc protrusion at L3-L4

contacting the right L3 nerve root[]"; and "[m]ild disc desiccation at T12-L1[]")). A subsequent

MRI performed on March 8, 2013, three months after the plaintiff's date last insured, revealed

"moderate right neural foraminal stenosis due to uncovertebral spurring" at C3-C4, "possible with

contact of the exiting right C4 nerve root." (Tr. 351-52, 392-93, 432-33). The ALJ appropriately

noted that, through his date last insured, the plaintiff walked without an assistive device; he was

able to drive locally; and, Dr. Parillo estimated that the plaintiff could walk approximately "four

. . . city blocks." (Tr. 524; *see* Tr. 228 (reports that he drives); Tr. 231 (plaintiff reported "not being

able to walk" but when asked to list assistive devices he used, he noted "[d]oes not apply"); Tr.

377)). Additionally, the ALJ, relying on the objective medical testing, concluded that Listing 1.04

was not met as the plaintiff had "mild stenosis (narrowing), not major disc herniation." (Tr. 524).

Accordingly, though the ALJ's discussion of the Listing criteria and the plaintiff's related medical

records related could have been more thorough, the ALJ's conclusion that the plaintiff did not

satisfy his burden of establishing that his impairment met Listing 1.04 is supported by substantial

evidence. *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam)

(nothing that "[a]n ALJ does not have to state on the record every reason justifying a decision,"

that "an ALJ is not required to discuss every piece of evidence submitted," and that "[a]n ALJ's

failure to cite specific evidence does not indicate that such evidence was not considered").

E.     THE ALJ DID NOT ERR IN HER RFC ASSESSMENT

As discussed above, upon remand, the ALJ was to hold another hearing and "to assess pain-

related and residual functional capacity issues described in the August 2016 Recommended

Ruling[.]" (Tr. 514).[8] Specifically, the case was remanded for "proper consideration and treatment

---

[8] In the August 2016 Recommended Ruling, Judge Margolis noted that "there [was] no less than eight medical opinions

of Dr. [Gary] Linke's opinion[,]" August 2016 Recommended Ruling at 24, and to "explain the weight assigned to the opinions of record," given that the ALJ failed to discuss their opinions in concluding "that [the] plaintiff [was] capable of a more restrictive RFC than the RFC made by both State medical consultants." *Id.* at 24.[9]

An RFC finding is the most an individual can do despite his or her impairments, 20 C.F.R. § 404.1545(a), and the plaintiff bears the burden of demonstrating that her functional limitations preclude any substantial gainful work. *See* 42 U.S.C. §§ 423(d)(5)(A), 1382(a)(3)(H)(i); 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say you are disabled. You must provide evidence, without redaction showing how your impairment(s) affects your functioning during the time you say you are disabled . . . ."). The plaintiff argues that, upon remand, the ALJ erred in her RFC assessment as she did not articulate the reasons why she assigned lesser weight to the opinions of Dr. Muneeb Samma, Dr. Lucien, and chiropractor Gary Linke. (Pl.'s Mem. at 3-7). Additionally, the plaintiff argues that the ALJ erred in her consideration of the plaintiff's pain. (Pl.'s Mem. at 18-21).

"The SSA recognizes a rule of deference to the medical views of a physician who is

---

of record, but only three of the opinions were rendered before plaintiff's date last insured." *See* August 2016 Recommended Ruling at 18. Those three opinions were from the plaintiff's chiropractor, Gary C. Linke, D.C., rendered on August 30, 2011 (Tr. 385-87); the consultative examiner, Dr. Frank Mongillo, rendered on August 30, 2012 (Tr. 319-21); and, the State agency medical consultant, Dr. Jeanne Kuslis, rendered in September 2012. (Tr. 115). In addition, Judge Margolis discussed opinions by State agency medical consultant Dr. Joseph Connolly, Jr., dated January 9, 2013 (Tr. 126-27), another opinion from Dr. Linke, dated January 16, 2013 (Tr. 329-35), an opinion from Dr. Lucien Parillo, plaintiff's pain management physician, dated June 21, 2013 (Tr. 376-80), and opinions from Dr. Samma, plaintiff's primary care physician, dated July 3, 2013 (Tr. 367-70), and November 1, 2013 (Tr. 503-06). August 2016 Recommended Ruling at 10-14,18-26.

[9] In this case, the plaintiff does not claim error in the ALJ's treatment of the State agency consultants' assessments, but rather in the treatment of the opinions of Drs. Samma, Parillo and Linke. (Pl.'s Mem. at 3-6). He also argues that "[n]othing in Dr. Mongillo's consultative examination report supports the ALJ's finding for light work capacity." (Pl.'s Mem. at 6). As explained herein, the ALJ's RFC assessment in supported by substantial evidence in the record and is reflected in her consideration of the underlying treatment records of the plaintiff's treating providers.

engaged in the primary treatment of a claimant. Thus, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Greek v. Colvin*, 802 F.3d 370, 375-76 (2d Cir. 2015). In deciding whether to "give the treating source's opinion controlling weight," the ALJ must consider the factors listed in 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist[,]"must be considered. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "After considering the above factors, the ALJ must comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion." *Greek*, 802 F.3d at 375 (internal quotations and citations omitted).

1.  DR. MUNEEB SAMMA

Dr. Muneeb Samma, the plaintiff's primary care physician, completed a Medical Source Statement for plaintiff on July 3, 2013 (Tr. 367-70), in which he reported that the plaintiff had back pain, neck pain, and mild right upper extremity weakness, as well as depression. (Tr. 367-68). According to Dr. Samma, continuous sitting was limited to forty-five minutes (for a total of about four hours in an eight-hour work day), and continuous standing was limited to two hours (about two hours total in an eight-hour day). (Tr. 368). The plaintiff needed to be able to sit/stand/walk at will, and he required two to three unscheduled breaks of five to ten minutes each, per day due to "pain/paresthesias, numbness." (Tr. 368). He assessed that the plaintiff could have lifted up to ten pounds occasionally, but not more; twisting was limited to occasionally; he could

rarely stoop and could never crouch/squat, or climb stairs and ladders; and the plaintiff was significantly limited in his upper extremities for reaching, handling and fingering. (Tr. 369). Dr. Samma stated that the plaintiff would be "off task" 25% or more of a work day, that he could perform "low stress" work, that he would be subject to good and bad days, and that he would likely be absent from work "more than four days per month" due to his impairments or treatment for them. (Tr. 370). When asked for findings to support this conclusion, Dr. Samma cited "mild R upper extremity weakness," "lower back pain," and "neck pain[.]" (Tr. 367).

Dr. Samma completed a second Medical Source Statement on November 1, 2013 (Tr. 503-06), eleven months after the plaintiff's date last insured, in which he stated that the plaintiff had back pain, neck pain, mild right upper extremity weakness, and bilateral hand numbness. (Tr. 503). He also noted that depression and anxiety were present. (Tr. 503). Dr. Samma opined that continuous sitting was limited to thirty minutes (less than two hours total in an eight-hour work day) and continuous standing was limited to forty-five minutes (less than two hours total in an eight-hour work day). (Tr. 504). According to Dr. Samma, the plaintiff would need to be able to sit/stand/walk at will, and he would require three to four unscheduled breaks of five to ten minutes each, per day due to "pain/paresthesias, numbness[.]" (Tr. 504). He could lift less than ten pounds occasionally, but not more weight; twisting was limited to occasionally; he could rarely stoop; and he could never crouch/squat, or climb stairs and ladders. (Tr. 504). Additionally, Dr. Samma found that the plaintiff was significantly limited in his use of his upper extremities for reaching, handling and fingering. (Tr. 505). Dr. Samma opined that the plaintiff would be "off task" 25% or more of a work day; he was incapable of performing even "low stress" work; he would have good and bad days; and he would likely be absent from work "more than four days per month" due to his

impairments or treatment for them. (Tr. 506).

In her decision, the ALJ noted that there were "few clinical details" offered by Dr. Samma "to support [his] checklist," and, as explained above, when asked for such findings and objective signs in the forms, Dr. Samma added, "mild R upper extremity weakness" without any "reference to x-rays, ranges of motion, or motor/nerve signs." (Tr. 525). Additionally, the underlying records from Dr. Samma revealed that he did not start seeing the plaintiff for complaints of low back pain and "off and on" palpitations and anxiety until February 2013 (Tr. 339-40, 358-59). Dr. Samma also saw the plaintiff for bilateral hand numbness and chronic neck pain in March 2013. (Tr. 337, 356). The ALJ's consideration of the lack of medical signs and findings to support her opinion was appropriate. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). Accordingly, the ALJ did not err in her explanation that the "consistency and support of clinical findings, key factors to assess RFC comments, [were] notably absent[]" from Dr. Samma's opinion. (Tr. 525).

## 2.    DR. LUCEIN PARILLO

On June 21, 2013, Dr. Lucien Parillo, the plaintiff's pain management physician, completed a Medical Source Statement (Tr. 376-80) in which he reported that the plaintiff had cervical and lumbar degenerative disc disease, cervical stenosis and myofascial pain syndrome and that he was "unlikely to return to prior level of functional ability." (Tr. 376). Dr. Parillo noted the presence of chronic neck, lower back and chest pain; limited range of motion and functional impairment; pain localized to the anterior chest, neck and lower back, described as pressure, throbbing and aching; and pain that occurred daily, which was unremitting, was rated as a 7-8 out of 10, and was

exacerbated by movement. (Tr. 376). The plaintiff's anxiety affected his pain, and Dr. Parillo assessed that the plaintiff's pain would interfere with attention and concentration "[o]ften[.]" (Tr. 377). He noted that the plaintiff had no medication side effects "because he [was] not on any [at] present. He [was] unable to tolerate any medications due to nausea and dyspepsia." (Tr. 377). According to Dr. Parillo, the plaintiff could walk four city blocks without stopping or experiencing severe pain. (Tr. 377). Continuous sitting was limited to two hours (total of at least six hours in an eight-hour work day) and continuous standing was limited to fifteen minutes (about two hours total in an eight-hour work day). (Tr. 377-78). Periodic walking during the day was required every fifty minutes for at least five minutes, and he had to be able to sit/stand/walk at will. (Tr. 378). Dr. Parillo assessed that the plaintiff could lift less than ten pounds frequently and ten pounds occasionally and that he had no significant limitations on reaching, handling and fingering. (Tr. 379). The plaintiff could bend and twist at the waist occasionally, and he would be subject to good and bad days; he would likely be absent from work "about twice a month" due to his impairments or treatment for them. (Tr. 379).

The ALJ noted that Dr. Parillo "provided chronological progress notes in 2013, after the [date last insured], which at least give more specific clinical observations and neurological/reflex signs, etc." (Tr. 525).[10] The ALJ relied on these treatment notes which reflected improvement, and, in light of these treatment records, the ALJ assigned only "partial weight . . . to Dr. Parillo's functional comments because his own detailed, clinical observations [were] quite mild, normal or

_____

[10] The plaintiff was first seen by Dr. Parrillo on January 16, 2013 for his "constant, shooting, burning, sharp and stabbing[]" pain that shot down his right leg, and that increased when he was lifting or bending. (Tr. 398-99, 496-98). A month later, Dr. Parrillo administered an epidural injection to treat the plaintiff's diagnosis of lumbar radiculopathy. (Tr. 396-97, 492-95).

inconsistent with less than light work[,]" and his treatment resulted in improvement "without needing opiate drugs." (Tr. 525 (*see, e.g.,* Tr. 394, 490 (noting the plaintiff's activity level was "improving with [the] [then-]current treatment plan[]"; noting "that the non-opiate treatment regime [was] working well to control [his] discomfort[]" such that he was "able to partake in . . . activities of daily living as well as enjoy . . . leisure activities[]"), Tr. 400-01, 482-82 (noting "significant improvement in [the plaintiff's] pain level, physical function, and overall ability to engage in meaningful/rewarding pasttimes[]")). The opinion of a treating physician "is not afford[ed] controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record. . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing *Veino v. Barnhart*, 312 F.2d 578, 588 (2d Cir. 2002)).

The plaintiff argues that the ALJ erred in relying on Dr. Parillo's note that states that the plaintiff's "[g]ait is normal without assistive device[,]"when the same record also states that "[g]ait is antalgic without assistive device." (Pl.'s Mem. at 5; *see* Tr. 398). The ALJ, however, did not base her entire conclusion on the observation of the plaintiff's gait. The ALJ noted that these treatment records also reflected full range of motion, manual muscle testing of 5/5 strength, and the fact that, during the course of the thirty-minute appointment, Dr. Parillo noted that the plaintiff "concentrate[d] well and [was] not easily distracted." (Tr. 525; *see* Tr. 398-99). Additionally, other treatment records from Dr. Parillo were consistent with the level of functioning the ALJ noted in her decision. At his first appointment with Dr. Parillo on February 15, 2013, the date closest to the plaintiff's date last insured, Dr. Parillo noted that the plaintiff's gait was normal without an assistive device, his range of motion in lumbar spine was "full and functional[,]" he had "negative" straight leg raising, and he had 5/5 strength in his upper and lower extremities. (Tr.

396). Accordingly, the ALJ did not err in her treatment of Dr. Parillo's opinions as she appropriately considered the consistency of Dr. Parillo's opinions with his underlying treatment records, she adequately explained the reasons for assigning such opinions "partial" weight, and she concluded that the improvements in the plaintiff's "pain level and activity level . . . match[ed] the restricted RFC stated in [the ALJ's] decision[.]" (Tr. 525).

### 3.    CHIROPRACTOR – GARY LINKE

In her decision, the ALJ noted that, in his medical source statements (*see* Tr. 329-35, 385-87), Dr. Linke "assessed a 10 percent permanent partial disability, but recommended sitting for less than two hours in an eight-hour day, and standing/walking for less than two hours in that work day[,]" and "estimated there may be four sick days per month[.]" (Tr. 525-26).[11] The ALJ concluded, however, that the "more specific, clinical notes from physical therapy . . . support the limited, light RFC . . . with up to four hours of standing/walking[.]" (Tr. 526). The ALJ then discussed the details of Dr. Linke's treatment records, which the ALJ concluded "would support less work restrictions than [were] adopted [in the ALJ's RFC]." (Tr. 526).

In the remand order, the ALJ was directed to give "proper consideration and treatment of" the opinion of the plaintiff's chiropractor. August 2016 Recommended Ruling at 24. The ALJ complied with this direction through her thorough discussion of Dr. Linke's long treatment history of the plaintiff and Dr. Linke's findings over time.[12] The underlying treatment records reveal that

---

[11]In her decision, the ALJ cites to the August 2016 Recommended Ruling's discussion of Dr. Linke's 2013 statement. In the 2013 statement, Dr. Linke assessed the plaintiff as capable of lifting ten pounds or less occasionally, and less than ten pounds frequently; walking at least two hours in an eight-hour work day and sitting less than six hours in an eight-hour work day with a need for periodic alternation of sitting and standing; and his limited use of the lower extremities for the operation of foot controls due to chronic lower back pain, bulging/protruding discs, facet arthropathy, nerve root encroachment and sciatica. (Tr. 330).

[12] The plaintiff has been involved in several accidents over the past two decades: on September 12, 1995, he sustained

Dr. Linke diagnosed the plaintiff with a lumbar sprain and muscle spasms due to a work-related accident sustained on May 10, 2005. (Tr. 308, 382; <u>see</u> Tr. 309, 381). The plaintiff underwent physical therapy consisting of TENS electrical muscle stimulation, ultrasound, and manipulative therapy. (Tr. 309, 382). He was released on May 16, 2005, but returned

> on February 2, 3, 14, 22, 2006, with an acute exacerbation of chronic lower back pain. [The plaintiff] returned on the following dates with exacerbations of chronic low back pain: November 17, 20, 2006, April 4, 19, 2007, October 18, 2007, January 23, 24, 2008, September 8, 2008, December 18, 2008, February 26, 2009, March 5, 6, 2009. [The plaintiff] returned on March 10, 2010, with an acute exacerbation of lower back pain which has persisted since November of 2009.

(Tr. 309, 381; *see* Tr. 311). Eight months later, on February 15, 2011, Dr. Linke noted that the plaintiff still had "chronic lower back pain[,]" for which Dr. Linke assigned a "10% permanent impairment to the lumbar spine." (Tr. 310). Thus, although the ALJ incorrectly referred to this as a "10 percent permanent partial disability[,]" Dr. Linke's opinion as to the degree of disability for Workers' Compensation is inapplicable to the assessment of disability for social security. *See* 20 C.F.R. § 404.1504; *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (citing 20 C.F.R. § 404.1504).

As a chiropractor, Dr. Linke is not an "acceptable medical source" under the Act. *Eastman*, 241 F. Supp. 2d at 168. Nevertheless, the ALJ properly considered him as an "other source" and his opinions and treatment history as one piece of how the plaintiff's ability to function was affected. *See* Social Security Ruling 06-03p, 2006 WL 2329939, at *3 (S.S.A. Aug. 9, 2006). Thus,

---

a cervical and lumbar sprain in an automobile accident; on October 10, 1996, the plaintiff was involved in an accident which resulted in cervical and lumbar sprain; on November 15, 1999, the plaintiff fell and struck his head on the floor, causing him to experience pain, stiffness, and loss of mobility in the neck and lower back; and on May 10, 2005, the plaintiff was in a work-related accident in which he suffered a lumbar sprain and muscle spasm. (Tr. 308, 312-18). The plaintiff was in an automobile accident on July 15, 2008, which resulted in a cervical sprain, right shoulder sprain, lumbar sprain, and right brachial neuralgia. (Tr. 383-84). Thereafter, the plaintiff began chiropractic treatment with Dr. Linke. (Tr. 384).

the ALJ did not err in her consideration of Dr. Linke's treatment history and medical source statements.

### 4. ALJ'S CONSIDERATION OF CONSERVATIVE TREATMENT

In her decision, the ALJ concluded that

> [i]n terms of pain control, the ear[l]ier and later records are pertinent to his level of his subjective[] pain symptoms through his [date last insured]. Those symptoms were not so acute as to require surgery. He consistently pursued conservative care. He consistently told doctors he preferred to avoid opioid pain-control medications. He managed his own medical care and followed his medication plan on his own. In terms of pain, the limited nature and types of his medications, shown in his Disability Reports, support the RFC here.

(Tr. 527).

The plaintiff argues that the ALJ "plainly equated [the plaintiff's] decision to pursue conservative treatment as some manner of 'confession' that his symptoms and his pain were not as severe as he alleged." (Pl.'s Mem. at 20). The ALJ, however, must consider the claimant's medications and non-medication treatments received for pain relief. 20 C.F.R. § 404.1529(c)(3). Moreover, the ALJ did not rely on the plaintiff's conservative treatment to overcome valid the medical opinions of record, but rather, considered the plaintiff's conservative treatment as additional evidence to support her disability finding. *See Netter v. Astrue*, 272 F. App'x 54, 56 (2d Cir. 2008) (summary order) (holding that no error when "the district court relied on [the doctor's] conservative treatment regimen merely as additional evidence supporting the ALJ's determination rather than as 'compelling evidence sufficient in itself to overcome an 'otherwise valid medical opinion'").

### 5. ASSESSMENT OF THE PLAINTIFF'S PAIN

The ALJ concluded in her decision that the plaintiff's "medically determinable

impairments could reasonably be expected to cause intermittent pain and lifting/carrying limits." (Tr. 528). The plaintiff argues that the ALJ did not adequately consider the plaintiff's complaints of subjective pain. (Pl.'s Mem. at 20-21).

An ALJ "is not required to accept the claimant's subjective complaints without question; [s]he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). In this case, the ALJ adequately considered the plaintiff's daily activities, and the medical record relating to the relevant time period at issue, including the record of improvement with Dr. Parillo, as well as the Yale-New Haven Hospital records reflecting that the "patient's subjective level of pain did 'not correlate with imaging findings . . . .'" (Tr. 527; *see, e.g.,* Tr. 394, 490 (noting the plaintiff's activity level was "improving with [the] [then-]current treatment plan[]"; noting "that the non-opiate treatment regime [was] working well to control [his] discomfort[]" such that he was "able to partake in . . . activities of daily living as well as enjoy . . . leisure activities[]"), Tr. 400-01, 482-82 (noting "significant improvement in [the plaintiff's] pain level, physical function, and overall ability to engage in meaningful/rewarding pasttimes[]"); *see* Tr. 499-502). A "lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits." *Barry v. Colvin*, 606 F. App'x 621, 622 (2d Cir. 2015). Moreover, the ALJ's credibility determination is entitled to "great deference and can be reversed only if [it is] 'patently unreasonable.'" *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (citation omitted); *see also Wright v. Berryhill*, 687 F. App'x 45, 49 (2d Cir. 2017) (summary order) (describing the scope of review of an ALJ's credibility determination as "sharply

limited"). Based on the underlying record, the Court cannot conclude that the ALJ's assessment of the plaintiff's pain and her related credibility determination were patently unreasonable.

F.    THE ALJ DID NOT ERR IN HER STEP FIVE FINDING

"Although the plaintiff carries the burden of proof at Step One through Step Four, the burden shifts at Step Five and requires the Commissioner to show other work can be performed." *Holt v. Colvin*, No. 3:16-CV-01971 (VLB), 2018 WL 1293095, at *9 (D. Conn. Mar. 13, 2018) (citing *Brault v. Soc. Sec. Amin., Comm'r*, 683 F.3d 443, 445-46 (2d Cir. 2012)).  At Step Five, the Commissioner must determine whether "significant numbers of jobs exist in the national economy that the claimant can perform." *McIntrye v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(40)(v)).   One way in which the ALJ makes this determination is by "adducing testimony of a vocational expert[,]" *id.*, which is precisely what the ALJ did in this case.[13]

The vocational expert testified that the plaintiff could not perform his past work as a cook, which was performed at the medium exertional level as defined by the Dictionary of Occupational Titles ("DOT").  (Tr. 1498).  The expert testified, however, that a hypothetical individual could not perform the plaintiff's past work if such individual was limited to light work and to lifting and carrying ten pounds, was limited to four hours of standing or walking, could not climb ladders, ropes, scaffolds or stairs, could occasionally stoop and kneel, could not crouch or crawl, could frequently balance, and was limited to simple routine work with brief superficial interaction with others. (Tr. 1497-98).  The expert testified that a person with those limitations could perform the

---

[13] At the beginning of the testimony from the vocational expert, the plaintiff's counsel objected to the vocational expert's qualifications to testify as to the national job incidence data.  (Tr. 1496-97).  The ALJ overruled the objection and then solicited testimony from the expert.  (Tr. 1497-98).

work of an "assembler for small products[,]" with 22,000 national jobs, an "inspector and hand packager," with 20,000 national jobs, or as a "mailroom clerk[,]" with 10,000 national jobs, all performed at the light exertional level. (Tr. 1499).

He also testified that these jobs could be performed at the sedentary level, but the number of available jobs is a much smaller percentage as the jobs "predominantly" are performed at the light exertional level because they involve standing for more than two hours a day. (Tr. 1500). If such a person was off-task more than five minutes per hour, or absent more than once on a "regular and consistent basis and that would include instances of leaving early or coming in late[,]" then such a person subject to those limitations could not perform those jobs. (Tr. 1502; *see also* Tr. 1504). Upon questioning from the plaintiff's counsel, the vocational expert testified that, if such an individual was restricted to "occasional handling, fingering and reaching," that individual could not perform any of the identified jobs. (Tr. 1503).

The plaintiff argues that the ALJ erred in her reliance on the vocational expert's testimony. Specifically, the plaintiff contends that "it is not enough for the vocational expert to merely testify that jobs exist, there must be reliable testimony that the jobs exist in substantial numbers in the national economy." (Pl.'s Mem. at 23).

The vocational expert, however, "need not 'identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally.'" *Holt*, 2018 WL 1293095, at *9 (quoting *McIntrye*, 758 F.3d at 151). In this case, the vocational expert explained that he relied on the DOT descriptions of the representative jobs he identified, the Selected Characteristics of Occupations, Defined in the Revised Dictionary of Occupational Titles ("SCO"), and his own experience and training. (Tr. 1498-99, 1502 (explaining that the numbers are derived

from "the number of occupations that I believe currently exist within an SOC category" and then draw from "jobs on which I have observed or on which I am familiar with in both the regional and national labor markets[,]" and "I make my reduction based on my experience and training[,]" and the "DOT occupation is . . . certainly a minority of a total number of jobs in a large SOC category[,] so I make a reduction based upon what I feel is appropriate and what I generally see in the labor market through job advertising[,]" and "I also compare my estimates with other publicly and privately available sources[,] [b]ut, ultimately, the estimates are my own."); *see* Tr. 823-24 (vocational expert's resume)); *see* 20 C.F.R. § 404.1566(d)-(e). The ALJ did not err in relying on the vocational expert's testimony as "[a]n ALJ may rely on vocational expert testimony where the expert identified the sources consulted to determine the incidence factors." *Smith v. Berryhill*, Civ. No. 3:17 CV 2080 (KAD), 2019 WL 121781, at *3 (D. Conn. Jan. 7, 2019) (concluding the ALJ reasonably relied on vocational expert testimony when the numbers were derived from the DOT and "other reliable publications") (citing *Galiotti v. Astrue*, 266 F. App'x 66, 68 (2d Cir. 2008) (summary order) (affirming the ALJ's acceptance of the vocational expert's testimony as reliable, even though the expert "was unable to specify how is arrived at the number of jobs available in the economy")); *see Bradley v. Berryhill*, No. 3:16 CV 1478 (JAM), 2017 WL 3314000, at *3-4 (D. Conn. Aug. 3, 2017) (holding that ALJ did not err in relying on the vocational expert's numbers as he had "extensive experience and training in his field[,]" and he identified the sources he used to reach his opinion); *see also Harper v. Berryhill*, Civ. No. 3:16 CV 01168 (SALM), 2017 WL 3085806, at *16 (D. Conn. July 20, 2017) (holding that the ALJ's reliance on the vocational expert's expertise was reasonable in light of the expert's testimony that, in determining the incidence numbers, he referenced several publications). Moreover, an ALJ "reasonably credit[s]

[vocational expert] testimony [when it is] given on the basis of the expert's professional experience and clinical judgment, and [is] not undermined by any evidence in the record." *McIntyre*, 758 F.3d at 152.

Additionally, the plaintiff argues that the vocational expert did not identify a significant number of jobs, and thus, the ALJ erred in relying on the vocational expert's testimony. (Pl.'s Mem. at 25-26). As this Court (Underhill, J.) has explained: "Within the Second Circuit, 'courts have refused to draw a bright line standard for the minimum number of jobs required to show that work exists in significant numbers.'" *Hernandez v. Berryhill*, No. 3:17-CV-368 (SRU), 2018 WL 1532609, at *16 (D. Conn. Mar. 29, 2018) (quoting *Koutrakos v. Colvin,* No. 3:13 CV 1290 (JGM), 2015 WL 1190100, at *21 (D. Conn. Mar. 16, 2015) (recommended ruling) (citing *Barbato v. Astrue*, No. 09 CV 6530T, 2010 WL 2710521, at *7 (W.D.N.Y. July 7, 2010)). But, although there is no bright line minimum, "'[c]ourts have adopted a relatively low threshold number.'" *Hernandez*, 2018 WL 1532609, at *16 (quoting *Barbato*, 2010 WL 2710521, at *7) (citing *Koutrakos*, 2015 WL 1190100, at *22 (1,296 positions in the Connecticut and 152,000 positions nationwide were significant numbers); *Durante v. Colvin*, No. 3:13 CV 1298(JCH), 2014 WL 4843684, at *5 (D. Conn. Sept. 29, 2014) (620 positions in Connecticut and 650,000 positions nationwide were significant numbers); *Dugan v. Soc. Sec. Admin, Comm'r*, 501 F. App'x. 24, 25 (2d Cir. 2012) (summary order) (noting vocational expert's testimony identifying 600 positions in the local Vermont economy and 344,000 nationwide); *Flores v. Astrue*, No. 3:09 CV 1829 (JCH)(HBF), 2010 WL 5129121, at *10, 15 (D. Conn. Sept. 24, 2010) (affirming the ALJ's findings among which was the identification of a significant number of jobs available with 3,600 positions within the region and 380,000 positions nationwide), approved and adopted over objection, 2010 WL

5129110 (D. Conn. Dec. 9, 2010); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983) (affirming the district court's affirmance of the ALJ's findings among which was the finding that 150 positions in the regional economy and 112,000 positions nationwide were significant numbers); *Fox v. Comm'r of Soc. Sec.*, No. 6:02 CV 1160 (FJS/RFT), 2009 WL 367628, at *3 (N.D.N.Y. Feb. 13, 2009) (finding that 200 positions within the region and 132,980 positions nationwide were substantial numbers)).

The number of jobs identified in *Hernandez* was "344 jobs in Connecticut and 48,293 nationwide[,]" 2018 WL 1523609, at *17, which number was considered "significant[.]" 2018 WL 1532609, at *17 (citing *Consiglio v. Berryhill*, No. 3:17 CV 346 (SALM), 2018 WL 1046315, at *8 (D. Conn. Feb. 26, 2018) (26,400 national jobs); *Lillis v. Colvin*, No. 3:16 CV 269 (WIG), 2017 WL 784949, at *6 (D. Conn. Mar. 1, 2017) (16,770 national jobs); *Gilmore v. Comm'r of Soc. Sec.*, No. 15 CV 837 (NAM), 2016 WL 4079535, at *6 (N.D.N.Y. July 29, 2016) (20,620 national jobs); *Daniels v. Astrue*, No. 10 Civ. 6510 (RWS), 2012 WL 1415322, at *17 (S.D.N.Y. Apr. 18, 2012) (25,000 national jobs)). Accordingly, the 22,000 national jobs for an "assembler for small products[,]" the 20,000 national jobs for the "inspector and hand packager," and the 10,000 national jobs for the "mailroom clerk[]" fall within what is considered a "significant" number of jobs. (Tr. 1499). Accordingly, the ALJ did not err in accepting the vocational expert's testimony.

IV.    <u>CONCLUSION</u>

Accordingly, for the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 25) is *denied*, and the defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 30) is *granted*.

Dated at New Haven, Connecticut, this 15th day of February, 2019.

_/s/ Robert M. Spector, USMJ_
Robert M. Spector
United States Magistrate Judge